JOHN VALLELY, as Receiver of the State Bank of Milton, Appellant, v. THOMAS DEVANEY, Adelard Benoit, Geo. N. Marcotte, M. L. Sullivan, J. D. Beauchamp, Northern Livestock Company, Respondents.

(194 N. W. 903.)

**Bills and notes — makers and indorsers of notes given bank held estopped to defend on ground that they were accommodation paper.**

1. Where notes are given to a bank at the solicitation of its president to enable it to carry, in a form satisfactory to the bank examiner, an indebtedness owing by a corporation in which the president and the makers and indorsers of the notes are personally interested, and, where the bank subsequently fails and the receiver sues on the notes, the makers and indorsers are estopped to defend on the ground that the notes were given for the accommodation of the bank.

**Bills and notes — makers and indorsers of note held estopped to assert defense that officer of bank had secret fraudulent intentions.**

2. Where the undisputed evidence shows that the notes were given pursuant to the arrangement stated above with the understanding between the president of the bank and the makers and indorsers of the notes that the latter were not to be held personally liable and that the notes were not to be paid by them, the defendants are estopped, as against the receiver, to assert in defense that

Note.—On power of bank president to bind bank by agreement that liability of party to commercial paper shall not be enforced, see notes in 28 L.R.A.(N.S.) 501; 3 R. C. L. 442; 4 R. C. L. Supp. 186.

On power of bank president to assure maker of note that his obligation will not be enforced, see notes in 1 A.L.R. 703; 9 A.L.R. 1146.

On validity of obligation given bank as affected by concealment of illegal transactions, see notes in 26 L.R.A.(N.S.) 993; 34 L.R.A.(N.S.) 105; L.R.A.1916A, 1218.

the president of the bank entertained a secret fraudulent intention to hold
them personally liable to the bank.

Opinion filed July 23, 1923.

Bills and Notes, 8 C. J. § 1007 p. 722 n. 30, p. 723 n. 31.

Appeal from the District Court of Cavalier County, *Butz,* J.
Reversed and remanded.

*McIntyre, Burtness & Robbins* and *G. Grimson,* for appellant.

"Since a fraud must relate to facts then existing or which have
previously existed, the general rule that fraud cannot be predicated
on statements promissory in their nature and relating to future acts,
nor upon the mere failure to perform a promise or an agreement to do
something at a future time, or to make good subsequent conditions
which have been assured. Nor, it is held, is such nonperformance
alone even evidence of fraud." 12 R. C. L. 254.

False pretense is a misrepresentation as to an existing fact or past
event, and not a mere broken promise to do something in the future.
Spriggs v. Craig, 36 N. D. 160.

The accommodated party is he to whom the credit of the accom-
modation party is loaned, and is not necessarily the payee, since the
inquiry always is as to whom did the maker of the paper loan his credit
as a matter of fact. And the fact that one derives some incidental
benefit from the paper will not make it accommodation paper as to him.
8 C. J. 254.

Where a check was given by a third person to a bank without con-
sideration at the solicitation of the cashier, and immediately passed
to the credit of a depositor's overdue account to make the account whole,
the check was given for the accommodation of the depositor, and not
for the accommodation of the bank. The bank could sue thereon.
Neal v. Wilson (Mass.) 100 N. E. 544; First Nat. Bank v. Davidson,
188 N. W. 194; Metzger v. Seigall, 145 Pac. 72.

The maker of a note cannot defend an action thereon by showing an
oral agreement made at the time of its execution that he should not be
held liable, for the reason that this would violate the rule forbidding
the contradiction of the terms of a written instrument by parol evi-
dence. German-American State Bank v. Watson, 163 Pac. 637; Neal
v. Wilson, 100 N. E. 544.

A corporation is not charged with notice of facts because of knowledge on the part of an officer or agent, where the officer or agent is dealing with the corporation in his own interest, or where for any other reason his interest is adverse to that of the corporation, so that communication of the knowledge by him cannot be presumed. Woodworth Co. v. Carroll (Minn.) 112 N. W. 1054; Brookhouse v. Union Pub. Co. 73 N. H. 368, 6 Ann. Cas. 675.

*Price & Pierce* and *Thomas Devaney,* for respondents.

Whether or not the debt has been novated is a question of fact and depends upon the intention of the parties to the particular transaction claimed to be a novation. If the terms of the agreement are equivocal or uncertain, then it becomes a question of fact for the jury under suitable instruction. 29 Cyc. 1140.

The representation as to where the defendant was to place a culvert across the creek running through the plaintiff's land, and how the culvert was to be constructed with reference to its use by them, and that the road was to be built on a line running through the village of Rockford, and that its depot was to be located and built at a designated place, if taken as mere promises or assurances that the defendant would do these things, they would be insufficient, for fraud cannot be predicated of a mere promise, though it be afterwards unfulfilled. But if the agent in making those representations intended to create in the plaintiff's mind the belief that it was, as a fact, the then intention of the defendant to do the things mentioned, and the representations might be understood and were understood by plaintiffs as asserting that fact, then a charge of fraud can be based upon the representations. Albitz v. Minneapolis R. Co. 42 N. W. 394.

Accommodation paper is a bill or note to which the acceptor, drawer, maker or indorser, has put his name without consideration for the purpose of accommodating by a loan of his credit some other person who is to provide for the bill or note when it falls due. It represents and is a loan of credit to the party accommodated. 8 C. J. 252.

"The defendants executed the note for Blethen's accommodation with the intention and understanding that he should procure it to be discounted at the payee bank for his own personal benefit." Rae v. McDonald, 71 N. W. 11.

Evidence that a note was executed to a bank by one of its officers to take the place on the books, of a note of a debtor, after the comp-

troller of the currency had objected thereto; that the bank officers agreed that the note should create no liability against the defendant; that the debtor's note was also retained by the bank, and a mortgage taken thereafter to secure the same,—shows that defendant's note was without consideration. Bank v. Felt, 69 N. W. 1057; Central Bank & T. Co. v. Ford, 152 S. W. 700.

The defense that a promissory note was made as an accommodation to the payee is inseparably connected with the absence or want of consideration and evidence that it was so executed does not vary or contradict the written contract within the rule excluding parol evidence but tends only to establish the fact always open to inquiry between the parties that the note was without consideration. National Bank v. Bowens, 124 N. W. 241; Peoria Mfg. Co. v. Huff, 63 N. W. 121.

It thus appears that the defendant executed his first note, subsequently renewing it from time to time, and ultimately by the note in suit, for the purpose of having it take the place of the Naylor note. Pauley v. O'Brien, 69 Fed. 460; Rankin v. City Bank, 208 U. S. 541, 52 L. ed. 610.

BIRDZELL, J. This is an appeal from a judgment for the defendants and from an order denying a motion for judgment notwithstanding the verdict or in the alternative for a new trial in three consolidated actions upon as many promissory notes. By stipulation two additional actions, each on separate notes, abide the result of these cases. The facts are as follows: In 1918, one W. L. Dodson purchased a large herd of cattle at some distant point and took them to Cavalier county. In connection with the purchase he had given his note to the St. Paul Cattle Loan Company of South St. Paul for $28,000. This note was indorsed by B. Prom and was secured by a chattel mortgage on the cattle. From this herd some cattle were afterwards sold to the defendant Benoit, some to the defendant Beauchamp and some to the defendant Marcotte, all farmers living in the vicinity of Milton. In the summer of 1919, Benoit, Beauchamp, and Marcotte, together with the other defendants in this action, Devaney and Sullivan, organized a corporation under the laws of this state, which was known as the Northern Live Stock Company. When this company was organized the directors were Sullivan, Devaney, Marcotte, Beauchamp, Sheehan, and

Prom. Benoit was made president, Devaney, secretary, and Sheehan, treasurer. During the remainder of the year 1919, meetings were held and negotiations conducted with a view to the acquisition by the company of a large herd of live stock and of considerable land for ranch purposes. These negotiations were practically completed in December and soon after the first of the year, January 12th, a meeting was held at which they were finally completed. The details of the arrangement are not clear in the record and are perhaps immaterial. But it does appear that the various interested individuals named above turned their herds in to the company, each taking what is termed a lien note in settlement. The manner in which the corporation stock was distributed does not appear, except it does appear that Prom obtained $5,000 of stock on account of the purchase of the Dodson herd. There seems to have been an understanding reached, prior to the meeting of January 12, 1920, that no mortgage should appear as being given by the live stock company, so that the company might obtain the advantage of a better credit rating. Hence the so-called lien notes. It was apparently recognized at the January meeting that cattle were being turned in to the company upon which there were mortgages. The testimony is conflicting as to the discussion of the mortgages at this meeting, but the defendants all agree it was understood that the individuals, except Dodson, who turned their herds in, were to pay off their mortgages or secure releases. They further claim that at the time of this meeting they did not know of the South St. Paul Cattle Loan Company mortgage on the Dodson herd. They testify also that, while the subject of mortgages was under discussion and while each of the other owners stated the amount of the mortgage against his herd, Dodson and Prom remained silent, thus giving the impression that the Dodson herd was clear. It appears that the defendants in this action, other than Sullivan, did later clear up the mortgages on their herds. Early in July, 1920, Prom requested Benoit, the president of the live stock company, to accompany him to St. Paul. While they were there they went to the Stock Yards National Bank for the purpose of securing an extension of the $28,000 loan. Prom gave his note for $26,000 and secured Benoit's indorsement. He returned with this note to Milton and stated to the remaining members of the board of directors of the live stock company that the loan would be extended if they would indorse

this note; that otherwise it would be foreclosed and that, inasmuch as the mortgage covered so large a percentage of the cattle taken over, this would practically put the live stock company out of business. Upon these representations the note was indorsed by the remaining directors. They claim, however, to have derived from this transaction an understanding that Prom was to pay this debt personally. Soon after this, Benoit, as president of the company, shipped some three carloads of cattle to St. Paul and applied the proceeds on the cattle company loan. Up to this time expenses were being incurred in the care of the cattle which had been met by the State Bank of Milton in the following manner: Upon a note of the Northern Live Stock Company, dated December 1, 1919, due April 1, 1920, indorsed by Sullivan, Marcotte, Beauchamp, and Benoit, the bank advanced $1,000; upon a note of the Northern Live Stock Company, dated January 10, 1920 and due the 1st of May, the bank had advanced $693.22; upon a note of Benoit, dated January 12, 1920, and indorsed by Sullivan, Marcotte, and Devaney, and which was payable on or before the 12th of May, the bank advanced the amount of the note, $1,462; and upon the company note, dated January 31st and due the 15th of June, guaranteed by Devaney, Sullivan, Marcotte, Benoit, and Beauchamp, $1,000; total $4,155.22.

There was more than $5,000 paid out for the company on the checks of Benoit, over and above the funds derived from the notes, which was carried as an overdraft, so that by August 1, 1920 there was due the bank on account of notes, overdraft and interest, $10,133.84. Prom was president and managing officer of the bank. On or about August 1st, Prom met with the other directors of the Northern Live Stock Company at the office of Devaney in Langdon and proposed to them that they execute notes representing the amount that had been thus advanced for the benefit of the cattle company. It seems that previous to the meeting he had prepared notes for execution. At that meeting, notes were given by the various makers, dated August 1, 1920, in amounts as follows: Devaney, $2,000; Beauchamp, $2,000; Benoit, $3,000; Northern Live Stock Company, $2,500; Northern Live Stock Company, $633.84. Each of the individual notes was indorsed by the remaining four members of the board of directors, except Prom, and the company notes were indorsed by all except Prom. The failure of

Prom to execute or indorse the notes, according to the explanation given at the time, was due to the fact that they were to be held by the bank and he could not, as an officer of the bank, appear to be liable. These are the notes upon which the present actions were brought.

The testimony is to the effect that at the time the notes were executed, it was stated by Prom, in substance, that he desired the notes so that he might carry the live stock company loan in a manner that would be unobjectionable to the bank examiner and that, if these notes would be executed, the company debt would be in such shape that the bank could carry it; that upon being asked whether or not the individuals were to be liable, he had stated, in substance, that they would not be liable; that the entire obligation would be met from the assets of the live stock company; that he spoke of a prospective sale which a real estate broker was negotiating under a listing contract of some weeks standing and that the proceeds of this sale would more than liquidate the company obligations, and that these obligations would be the first to be satisfied out of the proceeds. The notes, aggregating $4,155.22, which were past due, were turned over to the secretary of the live stock company, marked "renewed" across the face. The secretary states, however, that the meeting had adjourned before the notes were delivered to him and that they were included among some papers handed him by Prom with an explanation that they were memoranda to show what the new notes were given for; that he did not examine the papers and did not know that the old notes were included until after this suit was brought.

The sale referred to did not materialize, and later that fall the company, lacking both the means and feed to care for the cattle longer, shipped them to South St. Paul where they were sold. The proceeds of the cattle, with the exception of those derived from the Sullivan herd, amounted to some nine thousand dollars and were applied on the St. Paul Cattle Loan Company mortgage. The proceeds of the Sullivan cattle were apparently applied on a prior mortgage which he had not removed or satisfied according to the agreement. The State Bank of Milton failed on December 3d and is insolvent. This action is brought by the receiver to collect these notes as assets of the bank. If the notes be considered as assets of the bank, it is nevertheless insolvent.

The principal contention upon this appeal is that the trial court

erred in not granting plaintiff's motion for judgment notwithstanding the verdict. It is contended that the facts, as shown by the record and as stated above, constitute no defense to a liability on the notes. On the other hand, it is contended by the defendant that the facts stated show the notes to have been executed for the accommodation of the bank, and, furthermore, that their execution was induced by fraud.

The fraud which it is claimed vitiated the original transaction was the concealment of the mortgage on the Dodson herd at the time they were turned in to the company in the meeting when everybody, except Dodson and Prom, disclosed the mortgages on their respective herds. It is urged that this fraud was operative during practically the whole time the expenses for the care of the cattle, which were advanced by the bank, were being incurred. While the notes in suit were given at a time subsequent to the discovery of this fraud, if fraud existed, it is said that they were given in circumstances that justified the defendants in treating the St. Paul Cattle Loan Company obligation as the personal debt of Prom, the maker of the renewal note. It is also claimed that their execution was directly induced by the promise of Prom that the defendants would not be held personally liable, a promise which he did not intend should be performed, for, as he testified, his very object in getting the notes was to obtain their personal liability for the advances to the live stock company. Are the rights of the bank, suing through the receiver, affected by the matters of defense which must be taken as established? We shall consider these defenses under two heads; first, accommodation to the bank, and, second, fraud.

It is elementary that the plaintiff is not entitled to a judgment notwithstanding the verdict is justifiable on the most favorable construction of the evidence. So, for the purpose of discussing this assignment of error in the light of the defenses asserted, we shall consider that the evidence establishes the following conclusions of fact: When the Dodson herd was turned in to the company there was fraudulent concealment by Prom and Dodson of the St. Paul Cattle Loan Company mortgage; that the fact remained concealed until about July 1st or some six months later; that substantially all of the advancements that were made by the bank and which are represented by the notes in suit were made during this time (some were made, indisputably, however, before the January meeting); that the note given in renewal of the debt to the

St. Paul Cattle Loan Company is the personal note of Prom and was given as such with the understanding that the mortgage security on the Dodson herd, then owned by the live stock company, should continue as a lien; that a month later when the notes in suit were given they were given to enable the bank to carry the live stock company obligations in a form satisfactory to the bank examiner; and that the individuals who gave them were induced to do so relying upon the promise made by Prom that they would not be held personally liable but that the notes would be discharged by the assets of the company, which promise was fraudulent in that Prom did not intend it to be performed, but intended to hold the defendants personally liable. Certainly, no view of the facts more favorable to the defendants is warranted by this record. The question, then, is "do these facts constitute a defense to the notes in the hands of the payee bank, at the suit of the receiver, the bank being insolvent. Whether the notes be considered as given in payment of the live stock company's obligation to the bank, or whether they be considered as having been given so that the obligation might still be carried by the bank, in which event they must be regarded as collateral security, is immaterial. In either event the bank is a holder for value. Comp. Laws, 1913, §§ 6910 and 6912; N. I. Law, §§ 25 and 27.

The clear and unmistakable meaning of the undisputed evidence descriptive of the transaction at the time the notes in suit were taken is that they were given to be turned over to the bank so that the bank could carry, in satisfactory form, the obligations which had been incurred by the live stock company, amounting to over $10,000, in the brief period of its existence. This is the testimony of the defendants themselves, and they practically agree as well that the necessity for giving the notes was that the bank could not carry this obligation in the shape it then stood, represented as it was by overdue notes and an overdraft, and that, unless the obligation were evidenced in some different manner, it would not be satisfactory to the bank examiner. As an obligation of the live stock company it was likewise in excess of the legal limit. If it be assumed that this understanding, together with the express promise that Prom is said to have given, that they would not be held personally liable, coexisted and further assuming that the effect of the whole transaction was to make the notes an accommodation

to the bank instead of the live stock company (and this is the most favorable view for the defendants), the defendants are liable under what we consider to be the sound rule of law adhered to by the overwhelming weight of authority. Where a note or other obligation is given to a bank with the avowed object of its appearing as assets for purposes of public examination, those who purport to be liable upon the obligation are estopped, as against creditors who would be prejudicially affected by the truth, to assert a secret understanding that they were not to be held liable. Where the action is brought by the receiver of an insolvent bank with which such an arrangement is claimed to exist, the other assets not being sufficient to satisfy the claims of creditors, the rule is applicable with all its force. Pauly v. O'Brien (C. C.) 69 Fed. 460; Lyons v. Benney, 230 Pa. 117, 34 L.R.A.(N.S.) 105, 79 Atl. 250; Harrington v. Connor, 51 Neb. 214, 70 N. W. 911; Murphy v. Gumaer, 16 Colo. App. 183, 70 Pac. 800; Arthur v. Brown, 91 S. C. 516, 74 S. E. 652; Neal. v. Wilson, 213 Mass. 336, 100 N. E. 544; Skagit State Bank v. Moody, 86 Wash. 286, L.R.A.1916A, 1215, 150 Pac. 425.

Banks are institutions subject to public regulation to the end that they may make proper loans and freely contract debts with depositors and others to achieve the ends of legitimate business. Careful examinations by public authority are required periodically in order that those who deal with banks may not be misled by appearances. To sanction any arrangement, therefore, whereby the real assets and securities of a bank are to be regarded as less than or different from the apparent assets and securities would tend to defeat the entire purpose of the regulatory measures. Those who participate in a transaction the object of which is to give to the assets of a bank a favorable appearance, for purposes of examination, but less favorable for purposes of liability or enforcement, are participating in a transaction which is fraudulent as to the public and as to the creditors, including depositors, in whose behalf regulation is primarily imposed. First Nat. Bank v. Davidson, 48 N. D. 944, 188 N. W. 194.

On the question of fraud, we think little need be said. It will be observed, from the statement of facts, that the fraud relied upon to defeat liability on the notes in question consists in the statement that the defendants were not to be personally held, a promise which was

fraudulent in that it was not intended to be kept. There seems to be some further contention that there was fraud in representing that the obligation of the live stock company to the bank would be met from the assets of the company when, as a matter of fact, Prom intended to apply the assets toward the payment of a mortgage securing the note upon which he was personally liable. This amounts substantially to the same thing and it all resolves to the primary fraud committed on these defendants in taking from them notes under a promise that they were not to be held personally liable, a promise which for one reason or another was not intended to be kept. Manifestly, if the defendants are estopped, under the rule of law heretofore previously applied, from asserting the accommodation character of the instruments, and, if the prime reason for that estoppel is that to permit them to show the true transaction would be to work a fraud on creditors, it must be obvious that the same reason precludes the assertion by them of the fraud of Prom, which, if allowed to be established, would have exactly the same effect. From the standpoint of creditors the promise upon which the defendants rely is fraudulent. If they cannot show, as against the receiver, that the note was for the accommodation of the bank, they should not be permitted to show that Prom entertained a dishonest intention (dishonest toward them) of holding them to the exact legal consequences of their act while stating to them that he did not do so. In other words, if the legal consequence of their act in giving a note for the accommodation of the bank is liability at the suit of the receiver, no different consequence can be attached by reason of the existence of a secret intention on the part of the officer of the bank that they were to be held to such a liability. So, we think the defense of fraud fails for the same reason that the defense of accommodation fails. The defendants cannot assert a collateral fraud of the character attributed to Prom when to do so would involve the perpetration of a fraud upon creditors in which they (the defendants) participated. This would permit them to take advantage of their own wrong.

It should be obvious that we decide nothing with respect to the liability of parties upon notes given to a bank for its accommodation where sued by the bank itself. It follows, from what has been said, that the facts, proven by the undisputed evidence in the case and by the testimony of the defendants themselves, do not establish any defense to

liability on the notes in suit, and it was error for the trial court to deny the motion for judgment non obstante.

It may not be improper to make a further observation touching the original consideration for the notes in suit which further substantiates the estoppel against the defendants. They stood in the bank in lieu of obligations previously incurred on behalf of the live stock company, some prior and some subsequent to the transaction of January 12th, which is the first transaction claimed to have been tainted by any fraud. The live stock company received benefits coextensive with the advancements made by the bank. There can be no question on the record before us but what the bank was not chargeable with any fraudulent concealment practiced by Prom in his own interest. Compton v. Bunker Hill Bank, 96 Ill. 301, 36 Am. Rep. 147, nor that Prom, while purporting to act for the bank in connection with his personal interests, could not bind the bank by a verbal promise that those who executed the notes to the bank would not be personally bound thereby. Bank of United States v. Dunn, 6 Pet. 51, 8 L. ed. 316; Neal v. Wilson, 213 Mass. 336, 100 N. E. 544; State Bank v. Forsyth, 41 Mont. 249, 28 L.R.A.(N.S.) 501, 108 Pac. 914; First Nat. Bank v. Lowther-Kaufman Oil & Coal Co. 66 W. Va. 505, 28 L.R.A.(N.S.) 511, 66 S. E. 713. While Prom's fraud, if it existed, would have warranted the live stock company in rescinding the contract, it would have made the contract only voidable, not void. If, therefore, while the live stock company continued to act under the contract, it incurred obligations to the bank, manifestly it could not defend against such obligations on the ground of another's fraud. The bank gained no advantage by that fraud. In fact the security it held for the moneys advanced to the company was impaired by the failure of Prom to personally remove the mortgage lien on the cattle. These defendants placed reliance in Prom's representation that there was no lien, and, after its discovery, that he would remove it, and they knew that he was dealing with them in the live stock company on his own account. Therefore, as between the bank and the defendants, it is more equitable to charge the latter than to visit the consequences of such fraud, if any, upon the bank. This consideration is an additional basis for the estoppel in favor of the receiver.

Judgment reversed and cause remanded with directions to enter judgment for the plaintiff.

BRONSON, Ch. J., and CHRISTIANSON, NUESSLE, and JOHNSON, JJ., concur.